**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JACQUELINE JACKSON, o/b/o J.L.P., a minor, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. H-08-2081 |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | § § § § | |
| Defendant. | § § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Pending before the court are cross-motions for summary judgment which were filed by Jacqueline Jackson ("Plaintiff," "Jackson"), on behalf of J.L.P., a minor, and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entries #8, #9; Defendant's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ["Defendant's Motion"], Docket Entries #11, #13). Each party has also filed a response to the competing motions. (Plaintiff's Response to the Commissioner's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #14; *see* Docket Entry #13). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be DENIED, and that Defendant's motion be GRANTED.

**Background**

On December 3, 2004, Plaintiff Jacqueline Jackson filed an application for Supplemental Security Income, under Title XVI of the Social Security Act ("the Act"), on behalf of her one-year-old son, J.L.P.  (Transcript ["Tr."] at 52-54).  Jackson claimed that J.L.P. had been disabled since July 1, 2004, due to torticollis,[1] a left eye astigmatism,[2] and difficulty with speech.  (Tr. at 59, 68).  The SSA denied Jackson's application on May 31, 2005, finding that J.L.P. is not disabled under the Act.  (Tr. at 38).  On June 17, 2005, Jackson petitioned for a reconsideration of that decision.  (Tr. at 43).  The SSA then had her case independently reviewed, but again denied J.L.P. benefits, on August 3, 2005.  (Tr. at 45-47).

On August 15, 2005, Jackson requested a hearing before an administrative law judge ("ALJ").  (Tr. at 48).  That hearing, before ALJ Kent R. Blaine, took place on August 8, 2006.  (Tr. at 711).  Jackson appeared and testified at the hearing, and was accompanied by her non-attorney representative, Sharon Carney.  (*Id*.).  The ALJ also heard testimony from Dr. Louis Giesel ("Dr. Giesel"), a pediatrician.  (Tr. at 720).  J.L.P. was present at the hearing, but he did not participate.  (Tr. at 711-13).

Following the hearing, the ALJ engaged in the following three-step, sequential analysis to determine the following factors:  (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a medically "severe" impairment or combination of impairments; and (3) if so, whether the child's impairment or combination of impairments meets, medically equals,

---

[1] "Torticollis" is "an abnormal condition in which the head is inclined to one side as a result of the contraction of the muscles on that side of the neck."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1629 (5th ed. 1998).

[2] "Astigmatism" is "an abnormal condition of the eye in which the light rays cannot be focused clearly in a point on the retina because the spheric curve of the cornea is not equal in all meridians."  *Id*. at 139.

2

or functionally equals the severity of one of the impairments listed in the regulations that govern the SSA ("Listing").   *See* 20 C.F.R. § 416.924(b)–(d).   At the third step of the analysis, the Commissioner evaluates the child's functioning in the following six domains:  (1) "acquiring and using information"; (2) "attending and completing tasks"; (3) "interacting and relating with others"; (4) "moving about and manipulating objects"; (5) "caring for [one]self"; and (6) "health and physical well-being."  *Id*. at § 416.926a(b)(1).   A child functionally equals the severity level of a Listing if his impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain.  *See id*. at § 416.926a(d).   A "marked" limitation is one that is "more than moderate, but less than extreme," and "interferes seriously with [his] ability to independently initiate, sustain, or complete activities."  *Id*. at § 416.926a(e)(2)(I).   A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities."  *Id*. at § 416.926a(e)(3)(I).   In determining whether a child claimant has a "marked" or an "extreme" limitation, the Commissioner must review all of the evidence of record and "compare [the child's] functioning to the typical functioning of [same-aged children] who do not have impairments."  *Id*. at § 416.926a(f)(1); *see id*. at § 416.926a(b).

Based on these principles, as well as his review of the evidence, the ALJ first noted that J.L.P. was a "newborn/young infant" when the application for benefits was filed, and "is currently an older infant," for purposes of the regulations.  (Tr. at 28).  He found that J.L.P. had "not engaged in substantial gainful activity at any time relevant to this decision."  (*Id*.).  He also determined that the child suffered from torticollis, a left-eye astigmatism, and "speech difficulty," and that those impairments were "severe."  (*Id*.).  However, he found that none of these impairments, alone or in combination, met, medically equaled, or functionally equaled the requirements of any Listing.  (*Id*.).

The ALJ further found that J.L.P. was not limited in his ability to attend to and complete tasks, to interact with and relate to others, and to care for himself.  (Tr. at 28-34).  He determined that the child was limited in health and physical well-being, but that this limitation was "less than marked." (Tr. at 34).  He concluded, ultimately, that J.L.P. "has not been disabled, as defined in the Social Security Act, since December 3, 2004, the date the application was filed."  (Tr. at 35).

On August 29, 2006, Jackson requested an Appeals Council review of the ALJ's decision. (*See* Tr. at 5).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On May 7, 2008, the Appeals Council denied Jackson's request, finding that no applicable reason for review existed.  (Tr. at 5).  With that ruling, the ALJ's findings became final.  On July 1, 2008, Jackson filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision to deny her son SSI benefits.  (Complaint, Docket Entry #1).  Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Plaintiff's motion for summary judgment be denied, and that Defendant's cross-motion for summary judgment be granted.

**Standard of Review**

Federal courts review the Commissioner's decision to deny disability benefits only to ascertain whether it is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence,

they must be affirmed." *Id.* (citing *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995)). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; subjective evidence of pain and disability; and the claimant's age and education.  *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In her motion for summary judgment, Jackson claims that J.L.P. is disabled due to "visual, speech, muscular-postural[,] and developmental impairments."  (Plaintiff's Motion at 2).  She contends specifically that her son suffers from torticollis, strabismus,[3] attention deficit disorder,[4] and developmental speech delays.  (*Id.*).  She asks the court to reverse the Commissioner's decision to

---

[3] "Strabismus" is "an abnormal ocular condition in which the visual axes of the eyes are not directed at the same point." *Id.* at 1546.

[4] "Attention Deficit Disorder" is "a syndrome affecting children, adolescents, and adults characterized by short attention span, hyperactivity, and poor concentration."  *Id.* at 147.

deny disability benefits for her son, and to remand this case to the ALJ, for two reasons.  (*Id.* at 4-11).  First, Jackson claims that the ALJ erred because he failed to identify which Listings he considered, and he did not explain how he decided that J.L.P.'s limitations did not meet that criteria. (*Id.* at 4).  Second, she contends that the ALJ failed to develop the record properly, particularly "regarding the medical expert's rejection of the evidence from treating sources relevant to the domains of functioning."  (*Id.* at 5-10).  Defendant insists, however, that the ALJ properly considered all of the evidence, and followed the applicable law, in determining that J.L.P. is not disabled.  (Defendant's Response at 11-12).

### *Medical Facts, Opinions, and Diagnoses*

Medical records show that J.L.P. was born, at full term, on December 2, 2003, by cesarean section, at Norton Hospital in Louisville, Kentucky.  (Tr. at 102, 430-96).  He weighed eight pounds, six ounces.  (Tr. at 430).  There were no reported complications during his birth.  (Tr. at 431).  J.L.P. was said to have a mild case of jaundice[5]  that was stabilized by the time he was discharged.  (Tr. at 453).  Beyond that, the records indicate that he was a healthy newborn, "alert and active," with normal reflexes, no sign of muscle weakness, and normal hearing.  (Tr. at 431-39, 444, 451, 463-96). J.L.P. and his mother were discharged from the hospital on December 5, 2003.  (Tr. at 430).  During his first four months, Jackson took J.L.P. to Norton Healthcare or Brownsboro Pediatrics approximately ten times.  (Tr. at 89-111, 497-574).  These appointments were for standard vaccinations and check-ups, as well as complaints including fever, teething, rash, vomiting, coughing, wheezing, crying, diarrhea, and constipation.  (*Id.*).  In these records, J.L.P.'s eyes are

---

[5] "Jaundice" is "a yellow discoloration of the skin, mucous membranes, and sclerae of the eyes, caused by greater than normal amounts of bilirubin in the blood."  *Id.* at 885.  In this case, when J.L.P. was discharged from the hospital, it was noted that his bilirubin level had stabilized.  (Tr. at 435).

regularly noted to be "normal," and his neck is reported to be "supple."  (*Id.*).  During that same

period, Jackson consulted after-hours pediatric nurses at least nine times, with questions regarding

conditions such as diarrhea, vomiting, and cradle cap.[6]  (Tr. at 106-11).  No mention is made of neck

problems or of apparent developmental problems during the first four to five months of J.L.P.'s life.

(*See* Tr. at 89-111, 497-574).

The next records, dating from May 7, 2004, document J.L.P.'s visits to the Louisville

Primary Care Center ("LPCC"), for routine immunizations and checkups.  (Tr. at 122-30).  At the

first appointment, which was his five-month checkup, he was examined by Dr. James Charasika

("Dr. Charasika"), a family practitioner.  (Tr. at 129).  Dr. Charasika noted that Jackson reported no

problems, and that J.L.P.'s "[e]xamination is normal."  (Tr. at 129).  At his six-month appointment,

however, Jane Hudnall ("Hudnall"), a registered nurse practitioner, noted the following:

> Mom brings in child today reports [sic] a rash broken out on the back of the neck and
> abdomen.  No fever.  The mom is also concerned due to almost every [sic] since the
> child was born he has held his head over to the left.  She says he will rarely hold his
> head up straight.

(Tr. at 127-28).  Hudnall found J.L.P. to be an  "[a]lert, smiling infant in no acute distress."  (Tr. at

127).  She also noted, however, that J.L.P. "does appear to keep the head deviated somewhat

towards the left," and that "[i]t is difficult to straighten the child's head."  (*Id.*).  Hudnall assessed

J.L.P. to be suffering from a "mildly erythemic[7] rash" and from torticollis.  (*Id.*).  She recommended

Triamcinolone[8] for his rash, and scheduled an appointment at the Kosair Orthopaedic Clinic for a

---

[6]  "Cradle cap" is "a common seborrheic dermatitis of infants."  MOSBY'S at 412.

[7]  The term "erythemic" refers to a "redness or inflammation of the skin or mucous membranes."  *Id*. at 583.

[8] "Triamcinolone" is an anti-inflammatory medication that is used to treat certain dermatological conditions.
*See id*. at 1648.

specialist's evaluation of his neck.  (Tr. at 128).  However, on August 3, 2004, when J.L.P. was eight months old, Hudnall noted that Jackson had not yet taken him to the Kosair Orthopaedic Clinic, allegedly because "[t]hey keep changing the appointment."  (Tr. at 125).  On this date, Jackson complained that J.L.P. had been "pulling on his ear for 2 days." (*Id*.).  Hudnall found that J.L.P. was in no acute distress, that he had normal respiratory and cardiac rates, and that only his left tympanic membrane[9] remained erythemic.  (*Id*.).  She examined J.L.P., and found that he had acute otitis media,[10] for which she recommended an antibiotic.  (*Id*.).  She also "strongly encouraged [Jackson] to follow-up with orthopedic [sic]." (*Id.*).  In her report, Hudnall also noted that Jackson had taken the baby to an ophthalmologist, and was told that he suffered from "strabismus." (*Id*.).  J.L.P. was seen again at LPCC on September 29, 2004, by Dr. Savitha Senthilkumar ("Dr. Senthilkumar"), a family practitioner, and was treated for an upper respiratory infection.  (Tr. at 123-24).  At that appointment, Dr. Senthilkumar noted that J.L.P. was "alert and oriented and actively playing with mom."  (Tr. at 123).

On June 24, 2004, Jackson sought help from First Steps Service Providers ("First Steps"), an early intervention service that is available in some states, including Kentucky.  (Tr. at 259).  Her request, which was referred to Betty Pike ("Pike"), was based on the fact that J.L.P.'s "head leans to the left," and that his "[left] eye turns in." (*Id.*).  On July 1, 2004, Pike (or another, unidentified, First Steps official) conducted an initial interview with Jackson and J.L.P. in their home.  (Tr. at 254-58).  At the interview, Jackson informed Pike that J.L.P. "has always turned [his] head cock eyed."  (Tr. at 255).  Jackson also complained that J.L.P. suffered from acid reflux.  (*Id.*).  Further,

---

[9] The "tympanic membrane" is "a thin semitransparent membrane in the middle ear that transmits sound vibrations to the internal ear by means of the auditory ossicles."  *Id.* at 1667.

[10] "Acute otitis media" is a severe "inflammation or infection of the middle ear."  *Id.* at 27, 1172.

Jackson reported that J.L.P. awakened every two to three hours during the night.  (*Id.*).  Pike's report of the interview included a notation that J.L.P. had been given an eye test by Dr. Greg Douglas ("Dr. Douglas"), an ophthalmologist, who discovered a stigma in the baby's left eye.  (Tr. at 256).  The report recommended that First Steps wait to take action regarding the eye conditions until J.L.P. turned one year old, at which time he should be reexamined to determine whether the eye condition had self-corrected before a patch or surgery was considered.  (*Id.*).  The interview also revealed that J.L.P. had no hearing difficulties, but that he had already suffered from two ear infections.  (*Id.*).  Pike reported that J.L.P. "interacts well," "enjoys smiling," "has good eye contact when you engage him," and is a "happy" baby.  (Tr. at 257).  She found that J.L.P. refuses to hold his bottle, but that he generally exhibits good hand-eye coordination and hand-to-mouth instincts.  (*Id.*).  She also noted that he could crawl, and could go in and out of a sitting position; that he was "[b]eginning to understand cause [and] effect"; and that he had learned to soothe himself with a pacifier.  (*Id.*).  Pike reported that J.L.P. could say "dada" and "mama," and that he "babbles," as well.  (*Id.*).

Another record, dated July 14, 2004, shows that J.L.P. was also evaluated by Child First Developmental Services ("Child First") to determine whether he was eligible to participate in the early intervention program.  (Tr. at 118-20, 281-83).  That interview was conducted by Beth Ennis ("Ennis"), a pediatric clinical specialist.  (Tr. at 281-82).  Ennis reported that, during their visit, J.L.P. "was awake, alert and in a good mood, interacting easily with the evaluator."  (Tr. at 281).  She also stated that J.L.P. "was pleasant and not concerned by the testing activities at all."  (*Id.*).  Ennis noted that J.L.P. "turns to sound, laughs and makes consonant sounds," and that he is learning to self-comfort.  (Tr. at 282).  She further noted that he "looks back and forth between two objects, repeats movement to encourage an activity to repeat, and explores objects in a variety of ways."

(*Id*.).  Ennis also evaluated J.L.P. using the Developmental Assessment of Young Children," in conjunction with a "parent interview and observation."  (*Id*.).  She found that the seven-and-one-half-month-old J.L.P. had the physical capabilities of a seven-month-old; the cognitive functioning of a six-month-old; the communication skills of a four-month-old; and the social-emotional and adaptive functioning of a two-month-old child.  (*Id*.).  Further, Ennis noted that J.L.P. "demonstrates tightness in his neck but is not showing increased use of one side of his body over the other."  (*Id*.).  She concluded that J.L.P. "should be considered eligible for services," and recommended that he be evaluated by a physical therapist.  (*Id*.).  On August 9, 2004, Jackson returned to Child First to have J.L.P. evaluated by Tony Henderson ("Henderson"), a physical therapist.  (Tr. at 118-20).  In his report, Henderson made the following notations:

> Mom reports that [J.L.P.] has been healthy overall, although he does have a minor problem with his left eye.  Mom reports that the left eye does not turn fully to the left, and it turns in when [J.L.P.] turns to the right.

(*Id*.).  Henderson found J.L.P. to be "alert and pleasant."  (Tr. at 118).  He also observed that J.L.P. was crawling, pulling himself into a standing position, and "cruising" along furniture.  (Tr. at 118-19).  On the other hand, Henderson noted that J.L.P. lost his balance from a sitting position several times during the evaluation.  (Tr. at 119).  In addition, he found that J.L.P. "[d]isplays poor active motion at the neck, and delayed balance reactions and gross motor skills."  (Tr. at 120).  Henderson recommended that J.L.P. attend physical therapy "once weekly for up to 60 minute sessions," and stated that the therapy should "focus on family education, and promoting functional play skills to help [his] progress."  (*Id*.).

On October 20, 2004, First Steps decided that J.L.P. was eligible for early intervention services.  (Tr. at 342).  First Steps assigned Alice Niehoff ("Niehoff"), a developmental therapist,

to J.L.P.'s case.  (Tr. at 338).  On that day and in the following months, the agency, or its counterpart

in Indiana, monitored and evaluated J.L.P.'s condition on a regular basis.  (*See, e.g.*, Tr. at 214-78,

331-35, 344-64).  For instance, the records show that when J.L.P. was ten months old, he exhibited

the cognitive abilities of a six-month-old, the physical development of a seven-month-old, the

communication skills of a four-month-old, and the "social/emotional" and adaptive functioning of

a two-month-old.  (Tr. at 331).  In another record, completed when J.L.P. was sixteen months old,

Niehoff reported that the child "has made progress and has many emerging skills."  (Tr. at 233).

Niehoff also recognized that J.L.P. "has a very supportive family that gets involved in therapy

sessions" and who "are very interested in ways to advance his development."  (*Id.*).  A third record,

documenting the progress of twenty-two-month-old J.L.P., indicates at least a 15% delay in two or

more areas of development.  (Tr. at 191).  And in another, completed when J.L.P. was twenty-eight

months old, Chrisney Bush ("Bush"), a speech-language pathologist, found "at least a 25% delay

in speech and language skills."  (Tr. at 264-65).

On December 31, 2005, Mary Anne Ater ("Ater"), a physical therapist, reported that J.L.P.'s

head tilt fluctuated from minimal to moderate-severe depending on the task at hand, and noted that

the tilt seemed to be "related to visual perception of the environment."  (Tr. at 322).  Ater diagnosed

him as suffering from functional torticollis, visual muscle imbalance, and a developmental delay.

(*Id.*).  On January 12, 2006, a First Steps report noted that J.L.P. had been scheduled to undergo eye

surgery, and concluded that "[h]is vision is most likely the cause of his torticollis (head tilt)."  (Tr.

at 277).  Following the surgery, Niehoff noted that Jackson reported some "improvement with

[J.L.P's] head tilt" since undergoing eye surgery.  (Tr. at 361).  At a later date, March 31, 2006, Ater

reported that J.L.P. "demonstrated increased fluctuation out of tilting and improved motor planning

with completion of adult stair ambulation following correction."  (Tr. at 266).  On June 30, 2006, Ater reported that J.L.P., at thirty-three months of age, had "gross motor skills solid to twenty-six and one-half to twenty-seven months."  (Tr. at 263).  She remarked that his "quality of skills is improving with decreasing degrees of head tilt," and recommended that he continue with therapy.  (*Id.*).

In a report completed in July, 2006, Bush noted that J.L.P. "requires regular redirection to . . . play interactively."  (Tr. at 262, 388-89).  She stated that, at thirty-one months, J.L.P. was performing at a fifteen-to-eighteen-month age range for language expression and language comprehension, and exhibited a twenty-five percent delay in speech and language skills.  (*Id.*).  Niehoff reported that J.L.P. was progressing, but that his cognitive skill level remained delayed, at twenty-four months.  (Tr. at 261).

Emergency room records show that J.L.P. was seen at Clark Memorial Hospital on September 22, 2004, because of a 103-degree fever and respiratory problems. (Tr. at 390-97).  Various lab tests and x-rays were taken to ensure that he did not have pneumonia or another serious illness.  (*Id.*).  He was treated with Tylenol, and he was released the same day.  (*Id.*).  The next day, however, J.L.P. went to Kosair Children's Hospital because of a fever, a rash, and trouble breathing.  (Tr. at 575-87).  He was diagnosed as suffering from chicken pox, and was discharged later that day in "good" condition.  (Tr. at 576, 579).  On September 27, 2004, J.L.P. returned to Clark Memorial Hospital because he was refusing to eat or drink.  (*Id.* at 398-403).  The diagnosis of chickenpox was confirmed, and J.L.P. was discharged after he demonstrated an interest in eating.  (Tr. at 400).  On December 7, 2004, J.L.P. went to Kosair Children's Hospital for treatment of a fever and nasal congestion, and was released with instructions to treat his fever with Tylenol or Motrin.  (Tr. at 588-

608).  The emergency room records show that J.L.P. went to Clark Memorial Hospital on a few

occasions in 2005, as well, for minor injuries and illnesses.  (Tr. at 404-26).  While some of the

writing is difficult to decipher, it does not appear that any of these emergency room records

reference neck problems or possible developmental delays.

On March 15, 2005, Dr. Nandalal Yepuri ("Dr. Yepuri"), a family practitioner, referred

J.L.P. to a Bridgepointe Goodwill ("Bridgepointe") facility in Clarksville, Indiana,[11] for a pediatric

physical therapy evaluation and treatment for his neck pain.  (Tr. at 166).  Physical therapist

Elizabeth Peterson ("Peterson") conducted the evaluation on March 23, 2005.  (Tr. at 165-72).

Peterson initially observed that J.L.P. exhibited "posture of head/neck tilted to left, decreased

cervical AROM and PROM,[12] [and] decreased cervical strength."  (Tr. at 165).  For these conditions,

she recommended ongoing physical therapy, laying out short-term and long-term goals for "cervical

ROM strengthening, therapeutic exercise[, and] activity to promote more neutral posture."  (Tr. at

165-67).  In her findings, Peterson stated that there were no concerns about J.L.P.'s speech,

behavior, fine motor skills, and feeding.  (Tr. at 168).  As part of her evaluation, Peterson completed

a Peabody Developmental Motor Scales examination.  (Tr. at 169, 288-304).  The results indicated

that the 15-month-old had a "gross motor skill age equivalent of 11-13 months stationary, [and] 14

months locomotion."  (Tr. at 169).  Shortly after Peterson's evaluation, J.L.P. began physical therapy

---

[11] It is unclear whether Jackson relocated her family to Indiana for any period of time, or just traveled back and forth between the neighboring states, for J.L.P.'s treatment.  It appears that she took advantage of state-run early intervention services in both states at one time or another.  In any event, it is clear that the hearing before the ALJ took place in Louisville, Kentucky, and that Jackson moved the family to Humble, Texas, while her request for review was pending.  (*See* Tr. at 711; Plaintiff's Motion at 1 n.1).

[12] In this instance, "ROM" is used as an abbreviation for "range of motion," which measures "the extent of movement of a joint, from maximum extension to maximum flexion, as measured in degrees of a circle."  MOSBY'S at 1382.  The term is sometimes qualified by words such as "active" (AROM), or "passive" (PROM).  *See id.* at 25, 1215, and 1382.

at Bridgepointe.  (Tr. at 141-64).  His physical therapist, Julia Massey ("Massey"), developed a treatment plan designed to stretch his neck muscles to encourage musculature strength and range of head rotation.  (Tr. at 158-59).  Massey's records show that, at the beginning, Jackson brought J.L.P. in as scheduled, but that their attendance soon began to decline.  (Tr. at 141-64).  For example, from May 15, 2005, through June 15, 2005, they attended only three out of the nine appointments scheduled.  (Tr. at 142).  Bridgepointe began to send notices to Jackson regarding the continued absenteeism, and her failure to notify them when she would not make it to a scheduled appointment.  (Tr. at 143-45).  When Jackson and J.L.P. did attend a therapy session, Massey reported that the baby "continue[d] to demo[nstrate] poor cervical posture."  (Tr. at 142).  Finally, on August 19, 2005, Bridgepointe officially discharged J.L.P. from the therapy program because of repeated absenteeism and lack of communication.  (Tr. at 284–87).  On the discharge papers, Massey noted that J.L.P. had participated in a total of eleven sessions, and that, in the six weeks leading up to this discharge, Jackson did not attempt to schedule any appointments.  (Tr. at 284, 287).  She also reported that J.L.P. had made some improvement, and that she still considered his neck problems to be muscular in nature and capable of correction through muscle strengthening.  (*Id.*).  Massey wrote that she instructed Jackson on continuing J.L.P.'s therapy at home.  (Tr. at 286-87).

Hospital records show that, on April 18, 2005, J.L.P. underwent tests and evaluations at Kosair Children's Hospital.  (Tr. at 609-43).  Ultrasound images were taken of J.L.P.'s kidneys, and the results were normal.  (Tr. at 610).  A CT scan was taken of his cervical spine, and it showed no evidence of fracture or dislocation.  (Tr. at 611).  However, it did reveal physiologic subluxation,[13]

---

[13] A "subluxation" is "a partial abnormal separation of the articular surfaces of a joint."  *Id.* at 827, 1558.

as well as "mild increased thickness to the right sternocleidomastoid,"[14] which the radiologist stated was consistent with torticollis.  (*Id.*).  J.L.P. returned to the hospital on April 29, 2005, because of neck pain.  (Tr. at 644-59).  X-rays were taken of his cervical spine, which revealed normal alignment for the cervical vertebrae and normal intervertebral disk spaces.  (Tr. at 645).  J.L.P. was prescribed a pediatric soft cervical collar to help relieve neck pain, and then he was discharged.  (Tr. at 646, 652-53).  On June 3, 2005, at Clark Memorial Hospital, J.L.P. underwent a bilateral myringotomy[15] with tube insertion, due to recurrent ear infections.  (Tr. at 414).

On May 3, 2005, Jackson took J.L.P. to the Occumedex USA health clinic, where he was examined by Dr. Mehmet Akaydin, Jr. ("Dr. Akaydin"), a general practitioner.  (Tr. at 131-34).  Dr. Akaydin made the following observations:

> Patient is an alert and extremely healthy, solid, robust and fit appearing child in all respects (moving around very well-appears to be quite well coordinated and was able to walk around the exam room without any balance or coordination difficulties of any kind).

(Tr. at 132).  He commented, as well, that J.L.P.'s "head was . . . leaning slightly to the left but he appeared able to move it quite well in all directions."  (*Id.*).  He also noted that J.L.P.'s "[m]uscle strength was totally normal (5/5) through all extremities," and that he appeared to have no Neurological or sensory abnormalities at the time.  (Tr. at 133)  In addition, Dr. Akaydin found that J.L.P. exhibited the following:

> Normal station and gait/ambulation without the need or utilization of any assistive

---

[14] "Sternocleidomastoid" is "a muscle of the neck that is attached to the mastoid process of the temporal bone and superior nuchal line and by separate heads to the sternum and clavicle" that "function together to flex the head." *Id*. at 1541.

[15] A bilateral "myringotomy" involves the surgical incision of both eardrums "performed to relieve pressure and release pus or fluid from the middle ear," and often includes the insertion of tubes "to improve drainage." *Id*. at 189, 1075.

> devices (quite good overall speed, stability, and sustainability without any evidence
> of balance or coordination difficulties of any kind).

(*Id*.).

On May 5, 2005, Dr. S. Roush ("Dr. Roush"), public health specialist, evaluated J.L.P. on

behalf of the state.  (Tr. at 135-40).  Dr. Roush referred to Dr. Akaydin's findings, as follows:

> Exam of 5/3/05 found child to be totally healthy.  Dr. [Akaydin] found nothing
> remarkable physically and described child as robust.  Developmental milestones are
> normal.

(Tr. at 135).  Based on the medical records, Dr. Roush found that J.L.P. was not limited in any of

the "domains" of functioning, namely, acquiring and using information; attending and completing

tasks; interacting and relating with others; moving and manipulating objects; caring for himself; and

health and physical well-being.  (Tr. at 137, 139).   He concluded that J.L.P. suffered from

"torticollis in neck" and "possible astigmatism," but that neither of those impairments met the

definition of "severe" for social security purposes.  (Tr. at 135).

On February 15, 2006, J.L.P. was admitted to Kosair Children's Hospital for "muscle eye

surgery" on his right eye.  (Tr. at 660-710).  The surgery was performed by Dr. Craig Douglas ("Dr.

Douglas"), an ophthalmologist, and no complications are noted.  (Tr. at 661-62, 680).  Dr. Douglas's

post-operative diagnosis was "[r]ight fourth nerve palsy with right hypertropia."  (Tr. at 661).

During this visit, Jackson also complained about her son's "head tilt."  (Tr. at 671).  However, it

does not appear that this condition was evaluated or treated at that time.  (*See id*.).

### *Educational Background and Present Age*

J.L.P. was born on December 2, 2003.  (Tr. at 51, 200).  At the time of the administrative

hearing, he was less than two years old, and had not yet entered the educational system.

16

### Subjective Complaints

In her application for benefits, which she filed on behalf of her son, Jackson claimed that J.L.P. was "disabled," and that the disability began July 1, 2004, when he was approximately seven months old.  (Tr. at 52).  In particular, she stated that J.L.P.'s head would tilt when he watched television, and that he would ask for help when it did so.  (Tr. at 59).  In her applications, however, she also stated that J.L.P. could feed himself and drink from a "sippy cup."  (Tr. at 58).  In addition, she said that he will indicate that he is hungry by "open[ing] the ice box door."  (Tr. at 59).  Jackson also reported that J.L.P. communicated using single words, such as "no," "stop," "mama," "dada," and "Sponge Bob," as well as body language, such as waving goodbye, or rubbing his eyes to show that he is tired.  (*Id*. at 59, 63).  She further stated that he understood words, and could follow instructions, for example, by fetching items on request.  (Tr. at 58-59).  Jackson stated that J.L.P. was a social child who had no difficulty being passed around from person to person. (Tr. at 58).  She reported that J.L.P. often played with his three-year-old brother, and sometimes with his two young cousins, ages one and three.  (*Id*.).  She reported that he played with toys, and that he was especially fond of playing "cars" and with his brother's noisy toy truck.  (*Id*.).  She also indicated that J.L.P. watched television.  (*Id*.).  Jackson wrote that J.L.P. was able to take care of himself in a manner that is "age appropriate."  (Tr. at 85).

At the hearing, Jackson testified that J.L.P., now two-and-one-half years old, suffers from a problem with his left eye.[16]  (Tr. at 716).  She added, however, that she probably would never have known that he had an eye problem if a doctor had not brought it to her attention.  (*Id*.).  She testified

---

[16] There appears to be some confusion regarding J.L.P.'s eye impairment, because while much of the record, including the ALJ's written decision, refers to the problem being with his left eye, the surgical records clearly show that he underwent surgery only on his right eye.  (*See, e.g.*, Tr. at 661, 678, 680).

that her son underwent surgery to correct his eye problem, but that she does not believe that the surgery has helped. (Tr. at 719-20). Jackson testified that J.L.P. also suffers from torticollis, a condition that makes his head lean to the left. That condition became apparent when he was approximately six months old. (Tr. at 716). She stated that he had physical therapy to help treat this condition, but that she could see no improvement. (Tr. at 716-17). However, she also testified that physical therapy had helped resolve other issues, including his balance. (Tr. at 718). Jackson testified that J.L.P. also received speech therapy and developmental therapy, which had taken place every week for at least the past year, but that he had not noticeably improved in those areas. (Tr. at 717). Jackson claimed, for example, that J.L.P. did not play as much as other children his age, and that he would trip when trying to run. (Tr. at 717-18). She also testified that each of the three therapists treated him in her house once a week. (Tr. at 717). Jackson testified that J.L.P. could feed himself, but that he did not sleep through the night, and awoke every two to three hours. (*Id.*). Jackson testified that she does not always understand what J.L.P. is trying to tell her, and stated that people outside of the family did not understand him at all. (Tr. at 719).

### *Expert Testimony*

At the hearing, the ALJ also heard testimony from Dr. Louis Giesel, a pediatrician. (Tr. at 720-22). Based on his review of the medical records, as well as Jackson's hearing testimony, Dr. Giesel testified that J.L.P. suffers from torticollis, and that he is receiving physical therapy to treat it. (Tr. at 720-21). He also testified that, while there are some references in the record to "astigmatism," he believed that J.L.P. "really has strabismus or a turning in of his left eye as opposed to astigmatism." (Tr. at 721). Dr. Giesel testified further that J.L.P. also suffers from a "speech difficulty," which is being treated by a speech therapist. (*Id.*). However, he acknowledged

18

that the speech capabilities of two-and-one-half-year-old children vary, and that children of that age may have more difficulty communicating with people who do not know them, than they do with family.  (*Id.*).  The ALJ asked for Dr. Giesel's opinion on whether J.L.P.'s conditions met the criteria for a "disability," as defined by the SSA.  (Tr. at 721-22).  The doctor testified that, in his opinion, none of the impairments, even in combination, meets the criteria for any Listing.  (Tr. at 721).  Dr. Giesel's testimony concluded with the following exchange with the ALJ regarding the impact of J.L.P.'s conditions on the six domains of child functioning:

Q      Do you -- with respect to the functional [equivalents], does he have any difficulty acquiring and using information?

A      No, I don't think that would be applicable really at this age --.

Q      All right . . .  what about attending and completing --

A      No.

Q      Relating with other people?

A      No.

Q      Let's see.  What -- moving and manipulating objects?

A      No.

Q      Caring for himself?

A      I don't think that's applicable.

Q      All right.  Let's see here.  Have I got all the ones that are --

A      Well, the last one is the general health, and I think --

Q      General health and physical well being?

A      Right.  That would be less than marked.

Q      Less than marked, and that's the only limitation?

19

A Of those -- yes, of those domains as they're listed.

(Tr. at 721-22 [referring to 20 C.F.R. § 416.926a(b)(1)].

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. (Tr. at 25–35). From his review of the record, the ALJ found that J.L.P. has never engaged in any substantial gainful activity. (Tr. at 28). He also determined that J.L.P. suffered from torticollis, astigmatism, and speech difficulty, and that these conditions were "severe." (*Id.*). However, the ALJ found that none of J.L.P.'s impairments, alone or in combination, met the criteria of any impairment "listed in 20 CFR 404 Subpart P, Appendix 1." (*Id.*). In making that determination, the ALJ considered J.L.P.'s limitations in the context of the six domains of child functioning. (Tr. at 29-34). He found that J.L.P. was not limited under any domain except the last, which involves general health and well being, but that his limitations in this domain are less than "marked." (*Id.*). The ALJ concluded that, because J.L.P. suffered no marked limitations under any of the domains, he was not disabled within the meaning of the Act. (Tr. at 35). With that conclusion, he denied the application for SSI disability benefits. (*Id.*). That denial prompted Jackson's request for judicial review.

Before this court, Jackson argues that J.L.P. qualifies for disability benefits because of "visual, speech, muscular-postural[,] and developmental impairments," namely, torticollis, strabismus, attention deficit disorder, and developmental speech difficulties. (Plaintiff's Motion at 2). She argues that the ALJ erred because he failed to specifically identify which Listings he considered. (*Id*. at 4). She also claims that he erred because he did not explain how he reached the conclusion that J.L.P.'s limitations do not meet or equal the criteria for any Listing. (*Id*.). In addition, Jackson argues that the ALJ erred because he failed to develop the record, particularly with

regard to "the medical expert's rejection of the evidence from treating sources relevant to the domains of functioning."  (*Id.* at 5-10).  She also claims that the medical expert was not given sufficient time to review certain evidence that she submitted just before the hearing.  (*Id.* at 9).  Jackson contends that if the ALJ had properly developed the record, he would have found that her son suffers from a "marked" limitation, at the least, in the following domains:  (I) attending and completing tasks; and (ii) interacting and relating with others.  (*Id.*).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

### Failure to Identify Listings

On behalf of her son, Jackson argues that the ALJ was obliged to identify, by name, the Listings that he considered in reaching his decision.  (Plaintiff's Motion at 4).  She also contends that the ALJ should have explained the basis for his finding that his condition did not meet or equal any of the Listings.  (*Id.*).  In support of these arguments, Plaintiff cites the opinion of the Fifth Circuit in *Audler v. Astrue*, in which the court found that the ALJ's lack of specific reference to the Listings rendered the decision "unreviewable."  501 F.3d 446, 448 (5th Cir. 2007).  In *Audler*, the Fifth Circuit explained that, without some indication of which Listings the ALJ considered, and how

he formed his decision, the district court had no way to know whether the decision was supported

by the record.  *See id.*  The Fifth Circuit held that, faced with like circumstances, a court should

utilize a two-pronged test to determine:  (I) whether the ALJ failed to make specific references to

the Listings he considered; and (ii) whether this error prejudiced the plaintiff.  *See id.*  In this case,

a brief perusal of the written decision confirms that the ALJ did not identify which Listings he

considered.  So the relevant issue is whether this error prejudiced the plaintiff.  *See id.*

In Social Security cases, a claimant generally establishes prejudice by showing that, absent

the error, the ALJ might have reached a different conclusion.  *See Newton*, 209 F.3d at 453; *Ripley*,

67 F. 3d at 557 n.22.  One Listing referenced by Plaintiff is Listing 102.00(A)(4)(b), which provides,

in relevant part, as follows:

> A cortical visual disorder is a disturbance of the posterior visual pathways or
> occipital lobes of the brain in which the visual system does not interpret what the
> eyes are seeing. It may result from such causes as traumatic brain injury, stroke,
> cardiac arrest, near drowning, a central nervous system infection such as meningitis
> or encephalitis, a tumor, or surgery. It can be temporary or permanent, and the
> amount of visual loss can vary. It is possible to have a cortical visual disorder and
> not have any abnormalities observed in a standard eye examination. Therefore, a
> diagnosis of a cortical visual disorder must be confirmed by documentation of the
> cause of the brain lesion. If neuroimaging or visual evoked response (VER) testing
> was performed, we will request a copy of the report or other medical evidence that
> describes the findings in the report.

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 102.00.  Here, even if the ALJ had expressly addressed this

Listing, the evidence does not support a finding that it applies to J.L.P.  The administrative record

contains no evidence of "traumatic brain injury, stroke, cardiac arrest, near drowning, a central

nervous system infection such as meningitis or encephalitis, a tumor, or surgery" that occurred

before J.L.P.'s symptoms first appeared.  *See id.*  It also includes no diagnoses of a cortical visual

disorder or a brain lesion.  In short, even if the ALJ had properly identified all relevant or suggested

Listings, it is clear that Listing 102.00(A)(4)(b) does not apply.   For that reason, Plaintiff cannot have been prejudiced by the ALJ's failure to reference it specifically.

Plaintiff also claims that the ALJ should have considered Listing 108.00(d)(4).  (Plaintiff's Motion at 6).  In relevant part, Listing 108.00 provides, as follows:

> Disfigurement or deformity resulting from skin lesions may result in loss of sight, hearing, speech, and the ability to chew (mastication). We evaluate these impairments and their effects under the special senses and speech listings in 102.00 and the digestive system listings in 105.00. Facial disfigurement or other physical deformities may also have effects we evaluate under the mental disorders listings in 112.00, such as when they affect mood or social functioning.

20 C.F.R.Pt. 404, Subpt. P, App. 1, at 108.00(d)(4).  In this case, there is no evidence that J.L.P. had skin lesions that led to disfigurement or deformity, which, in turn, resulted in "loss of sight, hearing, speech, and the ability to chew." *See id.*  Further, there is no evidence or suggestion that J.L.P. has a disfigurement or deformity that has affected his mental state in terms of mood, social functioning, or other manner. *See id.*  Indeed, to the contrary, there is overwhelming evidence that J.L.P. is a happy, engaging little boy who interacts well with his family, his doctors, his therapists, and others. (*See* Tr. at 58-59 [Jackson]; 118 [Henderson]; 123 [Dr. Senthilkumar]; 127 [Hudnall]; 132 [Dr. Akaydin]; 257 [Pike/First Steps]; 281-82 [Ennis]).  Under these circumstances, this Listing does not apply to J.L.P.'s condition and, so, the ALJ's failure to expressly discuss Listing 108.00 did not result in prejudice.

In addition, Plaintiff argues that the ALJ should have considered Listings 101.00(O) and 101.08.  (Plaintiff's Motion at 6).  Listing 101.08 applies to the following conditions:

> Soft tissue injury (*e.g.*, burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 101.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 101.00(O).

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 101.08.  Listing 101.00(O) provides, as follows:

> Major function of the face and head, for purposes of listing 101.08, relates to impact on any or all of the activities involving vision, hearing, speech, mastication, and the initiation of the digestive process.

*Id*. at 101.00(O).  In this case, there is no evidence of a soft tissue injury or of continuing surgical management.  As a result, the Listing does not apply, and Plaintiff has suffered no prejudice.

Plaintiff contends further that the ALJ should have considered Listing 111.09, which addresses communication impairments, because the records show that the speech pathologist continued to report J.L.P. at a twenty-five percent delay in language and speech skills even after one year of therapy.  (Plaintiff's Motion at 6).  Listing 119.09 requires the following findings:

> Communication impairment, associated with documented neurological disorder. And one of the following:
>
> A.    Documented speech deficit which significantly affects the clarity and content of the speech; or
>
> B.    Documented comprehension deficit resulting in ineffective verbal communication for age; or
>
> C.    Impairment of hearing as described under the criteria in 102.08.

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 111.09.  In this case,  it is documented  that J.L.P. suffers from speech difficulties, an attention deficit, and developmental delays in verbal speech.  For instance, Bush found that J.L.P. has problems with communication, and that, at one point, he exhibited a twenty-five percent delay in speech and language skills.  (Tr. at 262-65, 388-89). Niehoff reported that, at age two, J.L.P. was progressing, but that his cognitive skill level was nonetheless delayed.  (Tr. at 261).  However, there is no evidence that these delays are associated with an underlying neurological disorder, as required by Listing 111.09.  And, more to the point, J.L.P. does not have a documented neurological disorder of the type required by the Listing.  In fact,

after examining J.L.P. in 2005, Dr. Akaydin found no evidence of any neurological or sensory disorder.  (Tr. at 133).  And it is telling that, while there is evidence that Jackson was advised, on numerous occasions, to put her son in speech or developmental therapy, or to continue such therapy, she was not similarly advised to seek the opinion of a neurologist to rule out an underlying neurological cause.  (*See* Tr. at 262, 264-65).

Plaintiff also complains that the medical expert did not have an opportunity to review two exhibits prior to the hearing.  (Plaintiff's Motion at 7).  She argues specifically that "the record strongly suggests that the test results which documented significant speech delay as contemplated under Childhood Listing 111.09 were not considered by the [medical expert] when he testified that none of the section in the Childhood Listings were applicable to this case."  (Plaintiff's Motion at 7; Tr. 721).  Again, however, the record does not support a finding that Plaintiff was prejudiced if, indeed, any error occurred.  Under these circumstances, Plaintiff cannot show prejudice.

In sum, Plaintiff has failed to show that any error on the part of the ALJ in failing to identify the Listings he considered, to explain why he decided that the Listings were inapplicable, or to place less reliance on the medical expert's opinion because of insufficient time to review evidence, was prejudicial.  As a result, these matters do not warrant a reversal of the Commissioner's decision, nor do they justify a remand of this case to the SSA.

### *Failure to Develop the Record*

Plaintiff also argues that this case should be remanded because the ALJ failed to develop the record.  (Plaintiff's Motion at 5).  She is particularly concerned that too much weight was given to the opinions of those who never examined or treated J.L.P., alleging that further development of the

evidence from treating sources would have warranted a shift of emphasis.  (*Id*.).  As a threshold

matter, Plaintiff underscores that she was not represented by an attorney through the date of the

hearing.  It is well established that "[a]n ALJ owes a duty to a *pro se* claimant to help him or her

develop the administrative record."  *Reefer v. Barnhart*, 326 F.3d 376, 380 (3rd Cir. 2003).  The ALJ

"is under a heightened duty to scrupulously and conscientiously explore all relevant facts." *Castillo*

*v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir.2003); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir.1996).

This heightened duty exists even when the claimant is represented by a non-attorney representative.

*See Jones v. Barnhart*, 372 F. Supp. 2d 989, 1006 n.4 (S.D. Tex. 2005) (Botley, J.) (finding that

representation by a paralegal is not the same as representation by an attorney and that the ALJ still

has a heightened duty to develop the record).  If a claimant is not represented by an attorney, the

Fifth Circuit has stated, as follows:

> We will reverse the decision of an ALJ as not supported by substantial evidence if
> the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop
> the record, and (2) that the claimant was prejudiced thereby.

*Brock*, 84 F.3d at 728.  Jackson alleges here that the "ALJ had a duty to further develop this record

prior to reliance on the opinion of Dr. Giesel, who did not examine the claimant."  (Plaintiff's

Motion at 9).  She argues that the regulations that govern the SSA make it clear that an ALJ is

required to give more weight to an examining source than to a non-examining source.  (*Id*.).

However, the relevant regulation merely provides, as follows:

> **Examining relationship**. Generally, we give more weight to the opinion of a source
> who has examined you than to the opinion of a source who has not examined you.

20 C.F.R. § 404.1527(c)(1).  It also directs that more weight be given treating sources, when

warranted, and particularly to those who have treated the patient long enough to have "obtained a

longitudinal picture of your impairment."  20 C.F.R. § 404.1527 (d)(2)(I).          In this case,

Plaintiff simply does not show that the ALJ gave improper weight to the opinions of any source, or that obtaining additional evidence would have tipped the scales in favor of treating sources.

Further, even if the ALJ did commit error here, Plaintiff would have to show that she was prejudiced by that error.  *See Newton*, 209 F.3d at 453; *Ripley*, 67 F. 3d at 557 n.22.  To do so, she would have to show that, absent the error, the ALJ might have reached a different conclusion.  *See Newton*, 209 F.3d at 453; *Ripley*, 67 F. 3d at 557 n.22.  In this case, there is substantial evidence in the record to support the ALJ's decision, and much of that evidence comes from examining or treating sources.  *See Johnson*, 864 F.2d at 343–44; *Hames*, 707 F.2d at 164.  Under the regulations, a child's impairment  functionally equals the severity level of a Listing if that impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain.  *See* 20 C.F.R. § 416.926a(d).  A "marked" limitation is one that is "more than moderate, but less than extreme," and "interferes seriously with [his] ability to independently initiate, sustain, or complete activities."  *Id*. at § 416.926a(e)(2)(I).  A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities."  *Id*. at § 416.926a(e)(3)(I).  The six domains of child functioning are (1) "acquiring and using information"; (2) "attending and completing tasks"; (3) "interacting and relating with others"; (4) "moving about and manipulating objects"; (5) "caring for [one]self"; and (6) "health and physical well-being."  *Id*. at § 416.926a(b)(1).  The record contains evidence that J.L.P. was not markedly limited in the first domain, which measures his ability to acquire and use information.  For instance, in her report of her examination of and interview with J.L.P., Pike stated that J.L.P. was "[b]eginning to understand cause [and] effect."  (Tr. at 257).  In addition, Ennis noted that J.L.P. would turn upon hearing a sound.  (Tr. at 281-82).  Ennis also observed that he "look[ed] back and forth between two objects,

27

repeat[ed] movement to encourage an activity to repeat, and explore[d] objects in a variety of ways."
(*Id*.).   Notably, at the hearing, Dr. Giesel, a pediatrician, testified that he did not believe that this
domain was really applicable to this age group.  (Tr. at 121-22).  There is also some evidence that
J.L.P. could attend to and complete tasks, which is the second domain.  Taking his age into
consideration, evidence on this point would include his ability to follow instructions, to retrieve
things from his mother when asked, and to play with toys.  (Tr. at 58, 85).  As for the third domain,
there is a wealth of evidence that J.L.P. was not markedly limited in his ability to relate and to
interact with others.  Many examining and treating individuals found J.L.P. to be a happy, engaging
little boy who interacts well with his family, his doctors, his therapists, and others.  (*See* Tr. at 58-59
[Jackson]; 118 [Henderson]; 123 [Dr. Senthilkumar]; 127 [Hudnall]; 132 [Dr. Akaydin]; 257 [First
Steps]; 281-82 [Ennis]).   And despite his speech difficulties, the evidence shows that he could
communicate effectively.   At her evaluation, Pike observed that J.L.P. could say "dada" and
"mama."  (Tr. at 257).  Ennis, who evaluated him at the same time, noted that J.L.P. interacted by
laughing and making consonant sounds.  (Tr. at 281).  In the application for benefits, completed six
months after those initial evaluations, Jackson reported that J.L.P. could speak single words, such
as "no," "stop," "mama," "dada," and "Sponge Bob."  (Tr. at 59, 63).  Jackson also stated that her
son knew how to communicate with body language, such as waving goodbye, rubbing his eyes to
show that he is tired, or opening the refrigerator to show that he is hungry.  (Tr. at 59).  Jackson
reported, as well, that J.L.P. could understand words and follow simple instructions.  (Tr. at 58-59).
In addition, there is substantial evidence that J.L.P. could effectively interact with others.  At their
interview, Ennis noted that J.L.P. "interact[ed] easily" with her.  (Tr. at 281).  And, in her
application, Jackson stated that J.L.P. was a social child who had no difficulty being passed around
from person to person, and who often played with his three-year-old brother or his two young
cousins.  (Tr. at 58).  As for the fourth domain, there is evidence that J.L.P. was not markedly

limited in his ability to move and manipulate objects.  Examining and treating sources noted no

significant motor or coordination problems. (Tr. at 132-34 [Dr. Akaydin]; 257 [Pike]). Pike found

that J.L.P. generally exhibited good hand-eye coordination and hand-to-mouth instincts.  (Tr. at

257). Ennis observed that J.L.P. explored objects in different ways. (Tr. at 282). Peterson reported

that she had no concerns about the child's fine motor skills. (Tr. at 169, 288-304). When J.L.P. was

thirty-three months old, Ater found that his gross motor skills were "solid to twenty-six and one-half

to twenty-seven months." (Tr. at 263).  And Jackson stated that J.L.P. liked to play with toy cars,

which necessarily involves moving and manipulating objects. (*Id*. at 58). There is also evidence

that J.L.P. was not markedly limited in the fifth domain--his ability to care for himself--as would be

expected of a young child.  Pike observed that J.L.P. had learned to soothe himself by picking up

his pacifier and putting it into his mouth. (Tr. at 257). Ennis reported that J.L.P. was learning how

to comfort himself. (Tr. at 282). Further, there is evidence that J.L.P. could communicate his needs,

through words and body language. (Tr. at 58-59, 63, 85 [Jackson]; 257 [Pike]; 281 [Ennis]).  In

addition, in her application and at the hearing, Jackson stated that her son could feed himself, could

drink from a "sippy cup," and could share a snack with his brother. (Tr. at 58, 85, 717). Finally,

there is evidence that J.L.P. was not markedly limited in the sixth domain--health and well being.

At his examination, Dr. Akaydin found J.L.P. to be an "alert and extremely healthy, solid, robust and

fit appearing child in all respects." (Tr. at 131-34).  And at the hearing, Dr. Giesel testified that he

believed J.L.P. to be somewhat limited in this area, but not markedly so. (Tr. at 121-22).

        In sum, Plaintiff has not shown that the ALJ committed reversible error.  Instead, the

decision was  rendered in accordance with the law, and is supported by substantial evidence.  For

these reasons, the decision of the Commissioner to deny SSI benefits to J.L.P. should be upheld.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**.

It is also **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)©)), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 26th day of August, 2009.

MARY MILLOY
UNITED STATES MAGISTRATE JUDGE